E-FILED
Sunday, 12 April, 2026  11:50:35 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| HEATHER BAUTISTA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 2:26-cv-02108 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| REGENCY MANAGEMENT SERVICE, LLC, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## COMPLAINT

1.      Plaintiff Heather Bautista ("Plaintiff" or "Ms. Bautista") brings this action against Regency Management Service, LLC ("Defendant" or "Regency") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981").

2.      Ms. Bautista, an experienced HR professional, was hired by Regency as its Corporate HR Manager in February 2024 and was a consistently strong performer.

3.      During her employment, she witnessed systematic race-based discrimination at Regency, including the termination of employment of seven African American employees during one month in early 2025.

4.      On January 23, and February 4, 2025, Ms. Bautista raised concerns to Regency management about this pattern of discriminatory terminations and warned that the terminated employees might file discrimination charges.

5.      Two days after Ms. Bautista's complaint, on February 6, 2025, Regency called her into a meeting, placed her on administrative leave, confiscated her office keys, shut down her

computer access, and forced her from the premises. Within hours, Regency sent a company-wide email announcing that Ms. Bautista was "no longer with Regency," effectively terminating her employment without conducting any legitimate investigation. The timing and circumstances of her termination make clear that Regency's stated reasons were pretextual and that her termination was in direct retaliation for her protected complaints about and opposition to race discrimination.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over Plaintiff's Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3), 42 U.S.C. § 1981, and 28 U.S.C. § 1331, because the action arises under the laws of the United States.

7.      Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts business in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

9.      All conditions precedent to the filing of this lawsuit have been satisfied, including the exhaustion of administrative remedies as required by Title VII.  Specifically, Ms. Bautista timely filed a charge of discrimination with the EEOC on August 1, 2025, alleging race discrimination and retaliation. On January 13, 2026, the EEOC issued Ms. Bautista a Notice of Right to Sue. This lawsuit is timely filed within 90 days of the Notice of Rights.

## PARTIES

10.     Plaintiff Heather Bautista is White woman who resides in Champaign, Illinois. She holds a Bachelor's degree in Organizational Professional Development, and Master's degrees in Workforce Development and Training and Talent Development. Ms. Bautista is an experienced

2

human resources professional who was employed by Defendant as its Corporate HR Manager from February 7, 2024, until her termination on February 6, 2025.

11. Defendant Regency Management Service, LLC is a property management company that provides housing complex management services. Regency's principal place of business is located at 2417 Fields South Drive, Champaign, Illinois 61822. At all relevant times, Regency operated properties in multiple states, including facilities in Rochester, Minnesota where Ms. Bautista performed work-related duties. At all relevant times, Regency employed between 201 and 500 employees, and was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964 and Section 1981.

## FACTS GIVING RISE TO THIS ACTION

### A. Plaintiff's Employment and Exemplary Performance

12. On February 7, 2024, Regency Management Service, LLC hired Ms. Bautista as its Corporate HR Manager. As an experienced HR professional, she brought substantial expertise in employee relations, benefits administration, investigations, and HR compliance to her role with Regency.

13. Throughout her employment, Ms. Bautista performed her job duties exceptionally well. She managed open enrollment meetings, conducted employee benefits discussions, handled unemployment compensation claims, prepared termination reports, and advised management on HR matters. She received consistently positive feedback from her supervisors and colleagues.

14. On January 30, 2025, Ms. Bautista met with Laural Collins, Regency's VP of People and Culture, for her final 2024 performance review. During this meeting, Ms. Collins confirmed that Ms. Bautista had met all fourteen of her 2024 performance goals. Ms. Bautista was informed she would receive a 3% salary increase and a 20% performance bonus (prorated because

3

her employment began in February 2024 rather than January). Ms. Collins praised Ms. Bautista's work and expressed satisfaction with her performance.

15. At the time of her termination, Ms. Bautista had never been disciplined, formally or informally, for any performance deficiencies. She had never received a written warning, verbal warning, or counseling regarding her work. Regency has never identified any legitimate, non-discriminatory performance-based reason for her termination.

**B. Plaintiff's Role and Responsibilities in HR**

16. As Corporate HR Manager, Ms. Bautista's responsibilities included investigating employee complaints, monitoring company termination decisions, preparing HR reports and termination data, advising management on employment law compliance, and managing unemployment compensation claims.

17. Part of Ms. Bautista's job involved tracking employee separations and analyzing termination patterns to identify potential legal risks. She prepared regular turnover reports and presented termination data to senior management during HR meetings.

18. Ms. Bautista was responsible for ensuring Regency's compliance with federal and state employment laws, including Title VII of the Civil Rights Act. This included identifying potential discrimination issues and advising management on steps to minimize legal liability.

19. In performing her duties, Ms. Bautista regularly attended HR meetings with Laural Collins (VP of People and Culture), Cameron Rexroad (Payroll/HR Administrator), and other members of senior management including Brittney Warters (SVP/COO) and Kaci Conklin (Sr. Director of Operations).

4

**C. Ms. Bautista Observes a Pattern of Race Discrimination and Engages in Protected Activity**

20.     In January 2025, Ms. Bautista observed and documented a troubling pattern in Regency's termination data, which showed that for January 2025, a significant number of African American employees had been terminated within a 30-day period.  While one voluntarily quit, the others were involuntarily terminated.  One of the terminated employees raised allegations of discrimination through a series of emails to Regency Management and HR.

21.     In or around late January 2025, during an HR meeting, Laural Collins, Cameron Rexroad, and Ms. Bautista discussed the January termination data. During this meeting, they discussed the fact that the optics of a significant number of African American employees separating from Regency in a single month did not look good. It was initially discussed that the terminations appeared to be either a voluntary quit or appropriate terminations based on legitimate business reasons.

22.     However, as Ms. Bautista continued to review the termination data and consider the discrimination allegations that had been raised by one of the terminated employees, she became increasingly concerned about the pattern. Accordingly, on or around February 3, 2025, she asked Laural Collins whether she had reviewed the discrimination concerns raised by Jhazmyne Hunter and the January termination data showing multiple African American employee terminations.

23.     On February 4, 2025, after returning from a benefits meeting, Ms. Bautista met with Laural Collins and Cameron Rexroad to discuss her concerns. During this meeting, Ms. Bautista raised concerns that the pattern of terminations appeared discriminatory because only African American employees had been terminated during the relevant period. She specifically highlighted that seven African American employees had been involuntarily discharged in the past thirty days.

5

24.  Ms. Bautista warned Ms. Collins and Mr. Rexroad that the situation should be reviewed carefully and that the terminated employees might decide to file EEOC complaints against Regency. She expressed concern that Regency could face significant legal liability if the company could not demonstrate legitimate, non-discriminatory reasons for the terminations.

25.  Prior to her February 4, 2025 complaint about the discriminatory termination pattern, Ms. Bautista had also reported other instances of employee mistreatment to senior management. In December 2024, while visiting Regency's Rochester, Minnesota properties for open enrollment benefit meetings, two employees reported concerns to Ms. Bautista: one subordinate reported that the Company had deducted a portion of her performance bonus without explanation, and one supervisor reported that she had received a promotion within the Company, but no accompanying salary increase. Ms. Bautista reported both incidents to Laural Collins.

26.  In mid-December 2024, the same subordinate from Rochester reported an employee relations issue to Ms. Bautista involving a Director of Operations for the Rochester Region. The complaint involved that Director engaging in inappropriate gossip with a subordinate Community about company executives. Ms. Bautista forwarded these complaints to Ms. Collins. Ms. Collins initiated an investigation into the Director's behavior, which resulted in the Director receiving a Final Written Warning on January 2, 2025 for dishonesty and for having inappropriate conversations with a subordinate about company executives.

27.  On January 2, 2025, the same day the Director received her Final Written Warning, Laural Collins approached Ms. Bautista and apologized to her. Ms. Collins acknowledged that she had placed Ms. Bautista in a similar uncomfortable position by engaging Ms. Bautista in inappropriate conversations about the CEO and VP of the Company. This acknowledgment demonstrates that management was aware that discussing certain workplace issues could create

problems, yet management would later use allegations about similar discussions as a pretext for terminating Ms. Bautista.

**D. Regency Terminates Ms. Bautista's Employment Only Two Days After She Undoubtedly Raised Discrimination Concerns**

28.     On February 6, 2025, just two days after Ms. Bautista raised concerns about the discriminatory termination pattern and warned of potential EEOC complaints, Ms. Collins and SVP/COO Brittney Warters called Ms. Bautista into a meeting.

29.     This was the first time Ms. Bautista was informed that a complaint had allegedly been made about her conduct during her December 2024 Rochester visit, more than two months earlier. Ms. Collins and Ms. Warters accused Ms. Bautista of telling employees the Senior Director who had been given a final written warning, and the direct report also engaged in that incident, that "no one is getting a raise, and no one is getting a bonus" for 2025.

30.     Critically, at the time of the December 2024 Rochester visit, raise and bonus decisions had not been made.  Therefore, it was impossible that Ms. Bautista was in possession of confidential raise and bonus information to share. There simply was no information at that time. While it has been alleged that Ms. Bautista inappropriately shared a spreadsheet with the two employees in Rochester, that is false.

31.     During the February 6 meeting, Ms. Collins and Ms. Warters also referenced Ms. Bautista's recent comments about potential EEOC complaints being filed against Regency by the seven terminated African American employees, directly linking the meeting and termination to Ms. Bautista's protected activity.

32.     Ms. Bautista vehemently denied making misleading statements to employees about raises and bonuses. She did not recall making any blanket statements about company-wide

compensation decisions. She asked if she could apologize to the employees if there had been any misunderstanding.

33.    Ms. Collins told Ms. Bautista that the situation was "very concerning" because, if the allegations were true, Ms. Bautista had violated company confidentiality as the HR Manager.

34.    Ms. Collins immediately placed Ms. Bautista on administrative leave pending investigation. She informed Ms. Bautista that she would have to relinquish her office keys and that Regency would be shutting down her online access to company accounts. Ms. Bautista acknowledged that she understood.

35.    Ms. Collins then walked Ms. Bautista to her office to retrieve her office keys and personal belongings. When they arrived at Ms. Bautista's office, Ms. Bautista gave Ms. Collins her keys and grabbed some of her personal items.

36.    As Ms. Bautista was gathering her belongings, she also began taking some additional items from her office. According to Regency's own account, Ms. Bautista stated, "I know where this is going" and indicated she wanted to take her personal items because she did not want to have to come back for them.  Ms. Bautista stated this, because she had seen prior situations where employees were placed on leave and then terminated for pretextual reasons, without any real investigation or fair opportunity to explain themselves, and another Regency employee had told her about something similar happening to another terminated employee.

37.    Ms. Collins reminded Ms. Bautista that they were not at the point of termination and that the matter was still being investigated. However, Ms. Collins also told Ms. Bautista that she would not be allowed to pack up all of her personal items at that time and made a comment about how she thought she would have gone far in the Company.

8

38. Ms. Bautista ultimately left the office carrying some items. She asked Ms. Collins to retrieve a family picture that she had left behind. Critically, Ms. Bautista left behind most of her belongings in her office, including approximately six additional boxes of personal items, which were later returned to her home on February 8, 2025.

39. The totality of the circumstances, including the way her keys and access were taken, and the way she was escorted from the building, led Ms. Bautista to believe that Regency was in fact terminating her employment.

40. That belief was later confirmed.  At 2:39 PM on February 6, 2025, Ms. Collins sent a company-wide email to all Corporate Regency employees with the subject line "Heather Bautista." The email, marked with "High" importance, stated: "I wanted to let you know that Heather is no longer with Regency…."

41. Ms. Bautista was informed by coworkers that the company-wide email had been sent announcing that she was no longer with Regency.

42. At no point during the February 6, 2025 meeting or afterward did Ms. Bautista verbally (or otherwise) resign from her position. She never stated, "I quit" or "I resign." She never submitted a written resignation. She was simply told she was being placed on administrative leave pending investigation.

43. After learning that Ms. Collins had informed the Company she no longer work there, Ms. Bautista sent a text message to Ms. Collins explicitly denying that she had resigned and stating that she had been waiting to hear back as instructed by Ms. Collins.  Ms. Collins responded that when Ms. Bautista stated, "I know how this is going" and that she wanted to gather her personal belongings she "took that to mean" Ms. Bautista was quitting.

44.     Ms. Collins assumption and conclusion that Ms. Bautista was nothing more than a thinly veiled excuse to terminate her employment, without investigation

45.     Ms. Collins's own text message confirms that she merely interpreted Ms. Bautista's actions and statements as a resignation. She never asked Ms. Bautista if she was resigning. Ms. Bautista never stated she was resigning. Instead, Ms. Collins unilaterally "started the termination process" and sent out the company-wide termination announcement before any investigation was completed and without giving Ms. Bautista any opportunity to return from administrative leave. Ms. Collins could and should have sought clarification from Ms. Bautista.  But she did not do so. Instead, she seized the opportunity to terminate an employee who had complained of and opposed race discrimination, a mere two days after her protected complaint and without investigation.

46.     On February 8, 2025, a company employee returned approximately six boxes of Ms. Bautista's personal belongings to her home. The substantial volume of personal items that had been left behind in Ms. Bautista's office, demonstrates that Ms. Bautista had not cleared out her office on February 6, 2025 as Regency claims, because she did not quit.

### A.  The Stated Reason for Termination Was Pretextual

47.     The alleged reason for Ms. Bautista's termination—that she allegedly improperly shared confidential salary information and made false statements about raises and bonuses during her December 2024 Rochester visit—was pretextual and used to mask Regency's true discriminatory and retaliatory motives.

48.     The timing of the adverse action is highly suspicious. Regency claims that the alleged misconduct occurred in early December 2024, yet Regency did not confront Ms. Bautista about these allegations until February 6, 2025, more than two months later. During those two

months, Ms. Bautista received an extremely positive performance review, met all of her performance goals, and was awarded a salary increase and bonus.

49.     Critically, Regency only raised these stale allegations two days after Ms. Bautista complained about the discriminatory pattern of terminating African American employees and warned that the company faced potential EEOC liability.

50.     The investigation was a sham. Ms. Collins told Ms. Bautista on February 6, 2025 that she was being placed on administrative leave "pending investigation" and that Ms. Collins was "still investigating the situation." However, Ms. Collins never completed any legitimate investigation. Within hours of placing Ms. Bautista on leave, Ms. Collins sent a company-wide email announcing that Ms. Bautista was "no longer with Regency." Ms. Collins never interviewed Ms. Bautista again, never gave her a chance to respond to the allegations in detail, and never afforded her an opportunity to return from administrative leave.  Nor was there any investigation into Ms. Bautista's concerns about and opposition to race discrimination.

51.     When Ms. Bautista clarified only shortly after the Company-wide email was sent that she was not quitting and had not quit, instead of correcting course, Ms. Collins maintained her assumption and used it to effectively terminate Ms. Bautista.

52.     The alleged misconduct was condoned or previously known and not treated as serious. In January 2025, just weeks before Ms. Bautista's termination, Regency disciplined the above-mentioned Director for substantially similar conduct—having inappropriate conversations with subordinates and sharing information that should have remained confidential. However, Ms. Martinez was not terminated. She received only a Final Written Warning and was allowed to continue her employment.

53. Moreover, on January 2, 2025, Laural Collins explicitly apologized to Ms. Bautista for placing her in a similar position by engaging her in inappropriate conversations about company executives. This demonstrates that management knew about and tolerated this type of workplace communication, yet suddenly claimed it was grounds for immediate termination when a convenient pretext was needed to retaliate against Ms. Bautista.

54. There was no training on certain confidential company matters at Regency. If Regency had genuine concerns about employees improperly discussing confidential information, the company should have provided clear training and guidance rather than using vague allegations as a pretext for termination.

55. Regency's own witness statements and investigation materials contain inconsistencies and lack credibility. The Illinois Department of Employment Security Board of Review, which heard testimony from both Ms. Bautista and Regency's witnesses during unemployment proceedings, found that there was insufficient evidence in the record to support a finding that Ms. Bautista shared confidential information with employees to which they did not have authority to know.

56. Similarly situated employees who did not engage in protected activity were treated more favorably. As noted above, a Director engaged in substantially similar but received only a written warning rather than termination. Unlike Ms. Bautista, the Director was afforded the opportunity to continue her employment after receiving appropriate discipline. Ms. Bautista was not even afforded an investigation.

57. Ms. Bautista has suffered economic and emotional damages as a result of Regency's choices.

**CAUSES OF ACTION**

**COUNT I**
**Title VII Retaliation**

58.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, Paragraphs 1 through 57 of this Complaint.

59.     Plaintiff engaged in protected activity under Title VII of the Civil Rights Act of 1964 by complaining about race discrimination in the workplace and opposing discriminatory employment practices, when she raised concerns about the optics and data related to the pattern of terminating African American employees.

60.     Defendant had knowledge of Plaintiff's protected activity. Plaintiff made her complaints directly to Laural Collins, Regency's VP of People and Culture, and others. Plaintiff's February 4, 2025 meeting notes document her discussion about the discriminatory termination pattern, including the notation "Discussed that it looks like discrimination."

61.     Defendant took materially adverse employment actions against Plaintiff, including: (a) calling her into a confrontational meeting on February 6, 2025, just two days after she raised discrimination concerns; (b) accusing her of improper conduct based on stale allegations from more than two months earlier; (c) placing her on administrative leave; (d) confiscating her office keys and shutting down her computer access; (e) forcing her from the premises; (f) sending a company-wide email within hours announcing she was "no longer with Regency"; (g) failing to conduct any legitimate investigation; and (h) terminating her employment.

62.     There is a strong causal connection between Plaintiff's protected activity and the adverse employment actions. The temporal proximity is highly probative of retaliatory intent - Plaintiff was terminated just two days after warning management about potential EEOC liability arising from the discriminatory termination pattern. For more than two months after the alleged

December 2024 Rochester visit, Regency took no action against Plaintiff. During that time, she received a glowing performance review, met all fourteen of her performance goals, and was awarded a salary increase and bonus. Only after Plaintiff complained about race discrimination on February 4, 2025, did Regency suddenly resurrect stale allegations and use them as a pretext to terminate her employment.

63.     Defendant's stated reasons for the adverse employment actions are pretextual. The alleged misconduct—sharing confidential information and making statements about compensation—occurred in early December 2024, yet Regency did not address these allegations until February 6, 2025, immediately after Plaintiff's discrimination complaints. Moreover, Regency disciplined Beverly Martinez for substantially similar conduct but gave her only a written warning rather than termination. Regency's shifting explanations for the termination, inconsistent witness statements, and sham investigation further demonstrate pretext.

64.     As a result of Defendant's unlawful retaliation, Plaintiff suffered significant monetary loss, including loss of wages, benefits, promotional opportunities, and other employment benefits from February 6, 2025, to the present and continuing into the future.

65.     As a result of Defendant's unlawful retaliation, Plaintiff suffered and continues to suffer emotional pain, suffering, humiliation, mental anguish, damage to professional reputation, and other nonpecuniary losses. Plaintiff has required therapy and medication to cope with the emotional distress caused by the retaliatory termination.

66.     Defendant's retaliatory conduct was willful, malicious, and undertaken with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

## COUNT II
### Section 1981 Retaliation

67.     Plaintiff realleges and incorporates by reference, as if fully set forth herein, Paragraphs 1 through 57 of this Complaint.

68.     Plaintiff engaged in protected activity under 42 U.S.C. § 1981 by opposing race discrimination and advocating against discriminatory employment practices that denied African American employees equal contractual rights.

69.     Defendant had knowledge of Plaintiff's protected activity. Plaintiff made her complaints directly to Laural Collins, Regency's VP of People and Culture, and others. Plaintiff's February 4, 2025 meeting notes document her discussion about the discriminatory termination pattern, including the notation "Discussed that it looks like discrimination."

70.     Defendant took materially adverse employment actions against Plaintiff, including: (a) calling her into a confrontational meeting on February 6, 2025, just two days after she raised discrimination concerns; (b) accusing her of improper conduct based on stale allegations from more than two months earlier; (c) placing her on administrative leave; (d) confiscating her office keys and shutting down her computer access; (e) forcing her from the premises; (f) sending a company-wide email within hours announcing she was "no longer with Regency"; (g) failing to conduct any legitimate investigation; and (h) terminating her employment.

71.     There is a strong causal connection between Plaintiff's protected activity and the adverse employment actions. The temporal proximity is highly probative of retaliatory intent - Plaintiff was terminated just two days after warning management about potential EEOC liability arising from the discriminatory termination pattern. For more than two months after the alleged December 2024 Rochester visit, Regency took no action against Plaintiff. During that time, she received a glowing performance review, met all fourteen of her performance goals, and was

awarded a salary increase and bonus. Only after Plaintiff complained about race discrimination on February 4, 2025, did Regency suddenly resurrect stale allegations and use them as a pretext to terminate her employment.

72.     Defendant's stated reasons for the adverse employment actions are pretextual. The alleged misconduct—sharing confidential information and making statements about compensation—occurred in early December 2024, yet Regency did not address these allegations until February 6, 2025, immediately after Plaintiff's discrimination complaints. Moreover, Regency disciplined Beverly Martinez for substantially similar conduct but gave her only a written warning rather than termination. Regency's shifting explanations for the termination, inconsistent witness statements, and sham investigation further demonstrate pretext.

73.     As a result of Defendant's unlawful retaliation, Plaintiff suffered significant monetary loss, including loss of wages, benefits, promotional opportunities, and other employment benefits from February 6, 2025, to the present and continuing into the future.

74.     As a result of Defendant's unlawful retaliation, Plaintiff suffered and continues to suffer emotional pain, suffering, humiliation, mental anguish, damage to professional reputation, and other nonpecuniary losses. Plaintiff has required therapy and medication to cope with the emotional distress caused by the retaliatory termination.

75.     Defendant's retaliatory conduct was willful, malicious, and undertaken with reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Heather Bautista respectfully requests that this Court enter

judgment in her favor and against Defendant, and grant the following relief:

A.  Declaratory relief, including but not limited to a declaration that Defendant violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981;

B.  Back pay and front pay, including compensation for all lost wages, salary, bonuses, benefits, and other employment-related losses from the date of termination through judgment and into the future;

C.  Compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, embarrassment, damage to professional reputation, and other nonpecuniary losses;

D.  Punitive damages to the extent permitted by law, in an amount sufficient to punish Defendant and deter future discrimination and retaliation;

E.  Pre-judgment and post-judgment interest at the highest lawful rate;

F.  Reasonable attorneys' fees and costs of suit, as provided by Title VII (42 U.S.C. § 2000e-5(k)), Section 1981, and other applicable fee-shifting statutes; and

G.  Such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 12, 2026

Respectfully submitted,

s/ Laura E. Reasons
*Counsel for Plaintiff*

Laura E. Reasons (IARDC No. 6293622)
Reasons Employment Law
332 South Michigan Avenue
Suite 121, No. 5391
Chicago, Illinois 60604
(312) 545-9216
laura@reasonsemploymentlaw.com